IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARK FACUN ABELLA,<br><br>        Petitioner,<br><br>  vs.<br><br>TIM VIRGA, Warden,<br><br>        Respondent. | No. C 10-0303 LHK (PR)<br><br>ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY |

Petitioner, a state prisoner proceeding *pro se*, filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, and then an amended petition which superseded the original petition. The Court ordered Respondent to show cause why the amended petition should not be granted. Respondent has filed an answer addressing the merits of the petition. Petitioner has filed a traverse. Having reviewed the briefs and the underlying record, the Court concludes that Petitioner is not entitled to relief based on the claims presented and denies the petition.

**PROCEDURAL HISTORY**

Petitioner was sentenced to two consecutive terms of twenty-five years-to-life in state prison after his conviction for first degree murder and possession of a firearm with a prior juvenile adjudication in Contra Costa County Superior Court. Petitioner filed a direct appeal to the California Court of Appeal, which affirmed the conviction and judgment, and a subsequent

petition for review in the California Supreme Court, which denied the petition. Petitioner did not file any state habeas petitions. The instant federal habeas action was filed on January 21, 2010.

# BACKGROUND[1]

David Catalan testified that in the very early morning on September 25, 2004, he and [Eric] Lewis were driving with another friend, Gilberto Cruz, in a black BMW. They went to a Jack-in-the-Box restaurant in Pittsburg. Cruz was driving, Lewis was in the passenger seat, and Catalan was seated behind Lewis. When they were at the drive-thru window, someone approached the car on foot. The man "approached casually, just came up and talked to Eric." He asked the three men in the car for their names and then walked away. Catalan asked Lewis if he knew the man and Lewis said he did not. After the man left, "they were handing us our food when somebody else, a different person came up to the window and struck Eric - punched him like once or twice...." This second person then walked away. Catalan said, "We should leave," but Lewis opened his car door and got out. The first man returned to the BMW, and he and Lewis "got into a fist fight." Another person appeared and also hit Lewis. The man who had punched Lewis initially was standing behind the second and took "something out of a bag," which "seemed [to be] a long type of weapon," maybe three feet long. One of the responding officers testified that Catalan told him after the incident that the first man who punched Lewis went to the van, then returned to Lewis carrying a backpack "and retrieved what he described as a pistol grip style shotgun." The man walked up to Lewis, who had been knocked to the ground by one of the other men, and shot him.

Cruz testified that while he, Lewis, and Catalan were in Cruz's BMW at the Jack-in-the-Box awaiting their food, a man approached the passenger side window and spoke to Lewis. Then "he left and then I think he came back and started hitting on Lewis." Cruz was unsure whether it was the same man who first approached or another man from the van. Cruz began to pull away but Lewis told him to stop the car. Cruz complied, and Lewis "got out of the car and asked him why he got hit." Cruz saw the three men from the other car "going around" Lewis. He did not recall what the men were doing, only that "[t]here was argument first and then I don't know where I hear[d] the shot."

Before Lewis was shot, Cruz saw one of the men run to the van and get a black bag. The man opened the bag and pulled "a gun or something big" out of it. Cruz testified that he did not see Lewis shot, nor did he remember describing the shooting to the police. He testified, however, that Lewis was standing when he was shot. He was not able to identify any of the attackers.

Sergeant Steve Albanese of the Pittsburg Police Department testified that he interviewed Cruz on the morning of September 25, 2004. Cruz told him that he saw "the Filipino male go back to the vehicle that the three subjects came from and retrieve a black backpack. [¶]...[¶] He said that he came back up to the area where Lewis was lying on the ground, held the

---

[1] The facts of this case are taken from the California Court of Appeal opinion in *People v. Abella*, No. A121826 (Cal. App. 1 Dist. Apr. 24, 2009). (Ans. Ex. F ("Op").)

Order Denying Petition for Writ of Habeas Corpus; Denying COA
Abella303hcden.hhl.wpd                    2

backpack in his left hand, removed an item from the backpack with his right hand and discarded the backpack on the ground. [¶]...[¶] He described [the item removed from the backpack] as a short barrel shotgun... with a pistol grip [¶]...[¶]... and he believed it was a pump action." Cruz told Albanese that when he was shot, Lewis was "[l]ying on his back," and that he was not moving.

Amy Miller testified that in September 2004, she worked at the Jack-in-the-Box restaurant in Pittsburg. Around 3:00 a.m. on the day of the incident, two men in a black BMW came through the drive-thru. She heard "loud talking" through the speaker. While the men were waiting for their food at the window, defendant came up to the car and shouted at the two men. He then "hit the guy in the passenger seat" with his fist. The BMW pulled away and a gold mini van came up to the drive-thru window. Defendant ran in the direction that the BMW had gone. The driver of the mini-van paid for his food then ran after the BMW. Someone, Miller was unsure whether it was the original driver or another man, returned to the van and drove it away. Miller then "heard a pop and the lady [in the next car] said that there was someone laying on the floor." Miller then called 911.

Vickie Johnson testified that she was in the drive-thru at the Jack-in-the-Box at 2:30 or 3:00 in the morning on September 25, 2004. She was in line and there were several cars in front of her. Two men got out of a van and began arguing with a man who had gotten out of a car. She testified that one of the men from the van shot the man from the car with a sawed-off shotgun. The man who was shot did not have a gun. She did not see anyone else involved in the fight. When Johnson was interviewed by the police after the incident, she told them that the man from the car was being assaulted by the other two men, that it appeared as if he tripped or fell to the ground, and that he was trying to get away as the other two men [were] hitting him. She also told the police that he was on the ground when he was shot.

A forensic pathologist testified that in addition to the shotgun wound in his abdomen, Lewis had scrapes on his right hand, wrist, forearm, knee, lower leg, cheek, and left knee, thigh, elbow, forearm, shoulder, and fourth finger, and on his chin. He was bruised on his left groin, scrotum, right forehead, lips and the right side of the neck. He had lacerations from blunt force on his right lower lip and chin. These wounds were ["]inflicted at slightly before or at the time of death." He opined that Lewis was shot from "probably less than two feet" away in an upward trajectory from the front of Lewis' body to the back and that the gunshot wound was the cause of death.

Defendant testified that on September 25, 2004, he was with Jose Lopez and Nehemia Matakaionga at a Jack-in-the Box in Pittsburg. Matakaionga was driving, Lopez was in the passenger seat, and defendant was in the back of the vehicle. When they got to the restaurant he noticed a black car in front of their own that was "gas/breaking." He explained that the person driving "[s]tep[s] on the gas and you break and gives you a jerky motion." The black car did not hit the car defendant was in. Defendant said that because the car "was so close, I told Jose to go talk to them, see if they could be cool. [¶]...[¶] Jose went to go talk to 'em." Lopez returned quickly and told the others "They're not trying to hear us." This made defendant "upset, frustrated," so he "decided to go over there and see if I could talk to them myself." He approached the passenger side window, which was down, and tried to speak to the driver. "I noticed that they was all looking hostile, like

annoyed." I said, 'What's up with them?' And I told them 'Y'all be cool to the car behind you.' [¶]...[¶] Nobody said nothing to me. [¶]...[¶] They look, but they just annoyed. [¶]...[¶] I was talking, I noticed that the passenger had moved his body, his whole body towards me, as if he was gonna hurt me. [¶]...[¶] I hit him 'cause I felt like he was gonna come out and hit me." Defendant hit the passenger once. Then, he testified, "I didn't want anymore problems. I tried to walk away. [¶]...[¶] As I was walking away, I noticed Jose passing me by," heading towards the black car. "After that, Nehemia followed right behind him." Matakaionga and Lopez then "ran toward" defendant who "looked over his shoulder and I see 'em fighting." He saw "[t]wo on two people fighting from the people from the car." When he saw this, "I fully turned around, I turned my whole body around. I noticed that it looked like the person I was talking to, the driver, had a gun in his hand." "He was pointing the gun at me and my friends." When defendant saw this, "I wanted to go get my gun.... It was underneath the back seat of my van." Defendant retrieved the gun, "[a]nd as I turned to point at the person with the gun, I shot. [¶]...[¶] I know I didn't hit the person with the gun." He testified that he did not mean to shoot Lewis, but meant to shoot the man he believed had a gun because "I was afraid that he was going to shoot me and my friends." He also testified that he did not mean to hurt anyone. After he shot Lewis, he "panicked and left."

Defendant denied that the gun was in a bag before he shot Lewis. He testified that the weapon was a shotgun with a pistol grip, but denied that it was sawed-off. Defendant denied that Lewis was on the ground when defendant shot him. He testified that one of the other men was pointing a gun at him and that Lewis "was fighting one of my friends." Defendant testified that he threw the gun away "in the garbage" at the apartment complex where he lives. Defendant testified that he ran from the scene of the shooting "[j]ust all in a panic," but when asked, "the truth is you didn't panic, you started to destroy evidence to connect you with the murder... [i]sn't that right?" he answered, "Yes."

Defendant was charged by information with one count of murder (Pen. Code, § 187) with an allegation that he discharged a sawed-off shotgun within the meaning of Penal Code section 12022.53, subdivisions (b), (c), and (d), and one count of possessing a firearm with a prior juvenile adjudication. This second count alleged that "on or about March 31, 1995, in the Juvenile Court of the State of California, in and for the County of Contra Costa, the defendant was adjudged a ward of the juvenile court, because the defendant committed Assault with a Deadly Weapon," citing section 12021, subdivision (c)(1). The jury found defendant guilty on both counts and found the firearm enhancement allegation true. Defendant was sentenced to 25 years to life for the murder, plus a consecutive 25 years to life for the enhancement pursuant to Penal Code section 12022.53, subdivision (d). A midterm sentence of two years for the second count was stayed pursuant to Penal Code section 654.

(Op. at 1-5.)

## DISCUSSION

A.   Standard of Review

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in

custody pursuant to the judgment of a state court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). The first prong applies both to questions of law and to mixed questions of law and fact, *Williams v. Taylor*, 529 U.S. 362, 384-86 (2000), while the second prong applies to decisions based on factual determinations, *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412-13. A state court decision is an "unreasonable application of" Supreme Court authority, falling under the second clause of § 2254(d)(1), if the state court correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411.

In determining whether the state court's decision is contrary to, or involved an unreasonable application of, clearly established federal law, a federal court looks to the decision of the highest state court to address the merits of a Petitioner's claim in a reasoned decision. *LaJoie v. Thompson*, 217 F.3d 663, 669 n.7 (9th Cir. 2000). Here, that decision is the opinion of the California Court of Appeal.

B.   Petitioner's Claim

Petitioner claims that his right to due process was violated by the admission into evidence of his two prior juvenile adjudications for impeachment purposes. He also claims that trial counsel provided ineffective assistance by not adequately objecting to the admission of the prior convictions. Lastly, Petitioner claims that there was insufficient evidence to support the first degree murder conviction.

1. <u>Impeachment Evidence</u>

Petitioner first claims that the trial court erred when it admitted evidence that Petitioner had two prior juvenile adjudications for assault with a deadly weapon. The Court of Appeal summarized what transpired as follows:

> Before defendant testified, the prosecutor sought permission to impeach his testimony with evidence of three prior incidents, including two that are at issue on appeal: assaults with a deadly weapon, one in 1995 and one in 1997. [FN1] Defendant argued that because he was only nine years old in 1995 and eleven years old in 1997, if the trial court allowed evidence of those incidents to impeach him, they should "be sanitized." The prosecutor argued that the incidents were not stale because "defendant was still on [California Youth Authority] parole at the time of this offense. It's not like he had a long period of time that he was crime free. In fact, the reports indicate that he had enough parole violations... [that] he served actually his maximum time."
>
> FN1. The prosecutor also sought and was granted leave to impeach defendant with evidence of a strong-arm robbery in 1998. On appeal, defendant does not object to the admission of this incident.
>
> The court observed, "Under other circumstances, the first incident, when he was nine that involved his mother as the victim, I would say - stale is the wrong word, but occurred when he was quite young. The serious nature of it in reading the report it certainly belies his age. The behavior described in the police report and described by his mother and the father are the actions of - well, the actions we more often see with somebody older and quite serious in my estimation and troubling. So I think that mitigates against an argument that they're stale. And in light of the fact, I also note that there is a series of incidents without a great deal of break in between. And there - there are some other violations that are not, in particular, in between these events, other violations that aren't necessarily of moral turpitude, but shows a continuing pattern. So I think that the three are admissible to impeach." The court then went on to rule that the assaults with a deadly weapon could be referred to as "assault-related incidents involving a weapon, no other detail." [FN2]
>
> FN2. The probation report describes the first incident, when defendant was nine years old: he "was arrested after chasing his mother with a kitchen knife. He threatened her stating, 'If you get close to me, I'll kill you.' After Mrs. Abella approached him and told her son to give her the knife, the defendant lunged towards her and attempted to stab her in the chest. He then chased her through the house which prompted the mother to pick up a chair to keep her son from stabbing her. [¶] After being

> arrested and booked at the juvenile hall, the minor stated to his mother, 'When I get back, I'm going to kill you.'" The second incident apparently "occurred at the age of 12, after the defendant used a small handgun to pistol whip another individual."
>
> Defendant requested that the reference to a weapon be omitted, but the trial court declined to do so. "To sanitize it to assault could mean a fist fight, and it was substantially more than a fist fight, particularly the one involving his mother. And I don't think that we should mislead the jury. At the same time, we're balancing it with information that is so prejudicial that it becomes the focus, as opposed to the purpose of this is for impeachment. I don't know how else to sanitize it without making it meaningless, based on the behavior here." Defendant testified that in both 1995 and 1997 he was "involved in an assault involving a weapon." The jury was instructed that "The fact that a witness has been convicted of a felony, if this is a fact, may be considered by you only for the purpose of determining the believability of that witness. The fact of a conviction does not necessarily destroy or impair a witness' believability. It is one of the circumstances that you may consider in weighing the testimony of that witness."

(Op. at 5-7.)

The California Court of Appeal noted that because Petitioner did not object to the admission of the priors but rather only asked that they be further sanitized, he had waived any objection to their admission. (*Id.* at 7.) Nevertheless, it proceeded to review the trial court's ruling for abuse of discretion, and found that the juvenile priors were properly admitted for impeachment purposes.[2]

> ... "[T]he court or jury may consider in determining the credibility of a witness any matter that has any tendency in reason to prove or disprove the truthfulness of his testimony at the hearing..." (Evid. Code, § 781.) Evidence of prior juvenile adjudications evincing moral turpitude is admissible for this purpose, subject to the restrictions of Evidence Code section 352. (*People v. Lee* (1994) 28 Cal.App.4th 1724, 1740.) In considering whether to admit evidence of prior juvenile adjudications, the trial court must consider "(1) Whether the prior conviction reflects adversely on an individual's honesty or veracity; (2) the nearness or remoteness in time of a prior conviction; (3) whether the prior conviction is for the same or substantially similar conduct to the charged offense; and (4) what the effect will be if the defendant does not testify out of fear of being prejudiced because of impeachment by prior convictions. [Citation.] However, these factors need not be rigidly followed." (*People v. Muldrow* (1988) 202 Cal.App.3d 636, 644.)
>
> As to the first factor, assault with a deadly weapon is a crime of moral turpitude. "[A]lthough simple assault is not a crime of moral turpitude, assault with a deadly weapon is. As the court explained in [*People v.*] *Cavazos*

---

[2] This Court need not address Respondent's procedural default argument after reviewing the Court of Appeal's decision on the merits of the claim.

> [(1985) 172 Cal.App.3d 589, 595], 'The average person walking down the street would believe that anyone who unlawfully attempts to injure another with a deadly weapon is guilty of some degree of moral laxity.'" (*People v. Rivera* (2003) 107 Cal.App.4th 1374, 1381.) The assaults reflect on defendant's credibility in describing the murder as a panicked reaction rather than a calculated assault. [citation omitted.]
>
> The two juvenile adjudications were approximately seven and nine years prior to Lewis' killing. As the court noted, the juvenile adjudications also were for violent, assaultive conduct using a weapon, and there was no meaningful lapse of violent conduct on defendant's part between the earliest incident and his arrest for Lewis' murder. The fourth factor is not relevant since defendant testified in this case. Thus, although the two incidents were somewhat remote in time, the court was justified in considering them to reflect on defendant's credibility. Moreover, the trial court appropriately limited the evidence in such a manner that the jury was apprised of their nature but not unduly prejudiced by the details. The trial court eliminated the potentially inflammatory specifics of the prior offenses while approving inclusion of enough information to permit the jury to evaluate the significance of the offenses on defendant's credibility.

(Op. at 7-8.)

A state court's evidentiary ruling is not subject to federal habeas review unless the ruling violates federal law, either by infringing upon a specific federal constitutional or statutory provision or by depriving the defendant of the fundamentally fair trial guaranteed by due process. *See Pulley v. Harris*, 465 U.S. 37, 41 (1984); *Jammal v. Van de Kamp*, 926 F.2d 918, 919-20 (9th Cir. 1991); *Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985), *cert. denied*, 478 U.S. 1021 (1986). The admission of evidence is not subject to federal habeas review unless a specific constitutional guarantee is violated or the error is of such magnitude that the result is a denial of the fundamentally fair trial guaranteed by due process. *See Henry v. Kernan*, 197 F.3d 1021, 1031 (9th Cir. 1999); *Colley v. Sumner*, 784 F.2d 984, 990 (9th Cir.), *cert. denied*, 479 U.S. 839 (1986).

The due process inquiry in federal habeas review is whether the admission of evidence was arbitrary or so prejudicial that it rendered the trial fundamentally unfair. *Walters v. Maass*, 45 F.3d 1355, 1357 (9th Cir. 1995); *Colley*, 784 F.2d at 990. However, the admission of evidence violates due process only if there are no permissible inferences that the jury may draw from the evidence. *See Jammal*, 926 F.2d at 920.

Petitioner fails to show that the admission of his prior juvenile convictions was either

1  arbitrary or so prejudicial that it rendered the trail fundamentally unfair. *See Walters*, 45 F.3d
2  1357. First of all, the trial court's decision was clearly not arbitrary as the judge articulated his
3  balancing between the relevance of the prior convictions and their potential prejudicial effect in
4  determining that they should be admitted for the purpose of impeachment. *See supra* at 6.
5  Secondly, the trial court minimized any undue prejudicial affect of the priors by eliminating the
6  "potentially inflammatory specifics" and sanitizing them to "assault-related incidents involving a
7  weapon, no other detail." *Id.* at 7. Although Petitioner claims that the reference to weapons
8  should have been completely omitted, the trial court properly found that doing so would have
9  rendered the priors meaningless for the purpose of assessing credibility. *Id.* Petitioner's
10 assertion that the length of jury deliberations is an indicator that the admitted evidence was
11 prejudicial is not persuasive. (Pet. at 15.) The jury was given limiting instructions on the use of
12 the prior convictions, *i.e.*, "'only for the purpose of determining the believability of that
13 witness'" and as "'one of the circumstances that you may consider in weighing the testimony of
14 that witness.'" (Op. at 7.) A jury is presumed to follow its instructions. *Weeks v. Angelone*, 528
15 U.S. 225, 234 (2000). Accordingly, it cannot be said that there was any error of such magnitude
16 that the result was the denial of a fundamentally fair trial. *See Henry,* 197 F.3d at 1031.

17       Furthermore, Respondent correctly asserts that based on Petitioner's testimony that he
18 had two prior assaults with a weapon, "the jury could doubt the commitment to testifying
19 truthfully of a witness who had no compunction about illegally arming himself and committing
20 violent felonies." (Ans. at 8.) As the Court of Appeal stated, "'[t]he average person walking
21 down the street would believe that anyone who unlawfully attempts to injure another with a
22 deadly weapon is guilty of some degree of moral laxity'", and "[t]he assaults reflect on
23 [Petitioner's] credibility in describing the murder as a panicked reaction rather than a calculated
24 assault." (Op. at 8.) Certainly Petitioner's "moral laxity" is a permissible inference that the jury
25 may draw from Petitioner's two prior assaults with a weapon. *See Jammal*, 926 F.2d at 920.[3]  In

---

27       [3]*See, e.g.*, *Houston v. Roe*, 177 F.3d 901, 910 n.6 (9th Cir. 1999) (admission of similar prior
28 bad acts to show motive and intent, coupled with limiting instructions, was appropriate);
   *Terrovona v. Kincheloe*, 912 F.2d 1176, 1180-81 (9th Cir. 1990) (admission of prior bad act

Order Denying Petition for Writ of Habeas Corpus; Denying COA
Abella303hcden.hhl.wpd                              9

conclusion, Petitioner has not demonstrated that the California Court of Appeal's conclusion was unreasonable such that he warrants habeas relief on this claim. *See* 28 U.S.C. § 2254(d)(1).

### 2. Ineffective Assistance of Counsel

In the order to show cause, the Court liberally found that Petitioner stated a claim of ineffective assistance of counsel by his failure to adequately object to the admission of the two priors. (*See* Docket No. 8 at 2.) However, the Court notes that Petitioner admits in his petition that he "believes that his trial counsel properly objected to the introduction of impeachment of his two prior juvenile incidents of assault with a weapon." (Pet. at 16.) He continues with "but if this Court concludes otherwise, any failure of trial counsel to adequately object constitutes prejudicial ineffectiveness of counsel." (*Id.*)

The California Court of Appeal rejected this claim after finding that the prior juvenile adjudications were properly admitted.

> Nor did defendant's counsel provide ineffective assistance by failing to object to the admission of the juvenile adjudications. In order to prevail on a claim of ineffective assistance of counsel, defendant [] "must demonstrate both deficient performance under an objective standard of professional reasonableness and prejudice under a similarly objective standard of reasonable probability of an adverse effect on the outcome." (*People v. Waidla* (2000) 22 Cal.4th 690, 718.) Even if counsel had objected to the admission of the juvenile adjudications, in view of the court's remarks with respect to the objection that counsel did make, it is not likely that the objection would have been sustained, and if it had been sustained it is not reasonably probable that the exclusion of the two adjudications would have resulted in a more favorable verdict. (See *id.* at p. 719.) Although the prior offenses affected the credibility of defendant's claim of self defense (as did the third and most recent incident, the admissibility of which seems clear and is unchallenged), many inconsistencies between defendant's testimony and the testimony of other witnesses and the forensic evidence undermined his credibility far more forcefully. None of the witnesses, including the bystander witnesses, observed anyone other than defendant to have a gun, as defendant testified. Catalan, Johnson, and Cruz all told the police immediately after the incident that Lewis was lying on the ground when defendant shot him at close range. The forensic evidence indicated that Lewis was shot from less than two feet away at an upward angle, contrary to defendant's testimony that he shot Lewis from a distance.

---

testimony did not violate due process where trial court balanced probative weight against prejudicial effect and gave jury cautionary instruction), *cert. denied*, 499 U.S. 979 (1991); *Butcher v. Marquez*, 758 F.2d 373, 378 (9th Cir. 1985) (admission of uncharged offenses does not violate constitutional rights where jury had opportunity to weigh credibility of complaining witness and judge admonished jury to consider incident only as evidence of intent, not as evidence of bad character).

1  (Op. at 8-9.)

2  In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, Petitioner must establish two things. First, he must establish that counsel's performance was deficient, *i.e.*, that it fell below an "objective standard of reasonableness" under prevailing professional norms. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). Second, he must establish that he was prejudiced by counsel's deficient performance, *i.e.*, that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* A court need not determine whether counsel's performance was deficient if the lack of prejudice is clear. *Id.* at 697. On federal habeas, a petitioner must show that the state court applied *Strickland* to the facts of his case in an objectively unreasonable manner. *Yarborough v. Gentry*, 540 U.S. 1, 5 (2003) (per curiam).

As discussed in Petitioner's first claim, the admission of the prior juvenile adjudications for the purpose of impeachment was not error. *See supra* at 9-10. Accordingly, counsel's failure to make a meritless objection would not have constituted ineffective assistance. *See Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir. 2005) (failure to file a meritless motion is not ineffective). Furthermore, as discussed by the Court of Appeal, counsel's failure to object to the admission of the priors as a whole was unlikely to have yielded a better result in view of the trial court's remarks regarding counsel's limited objections. (Op. at 9.) The trial court found that the proffered impeachment evidence was relevant and capable of being sanitized from any potentially improper prejudicial effect. *See supra* at 9. The state appellate court also pointed out that the "many inconsistencies between [Petitioner's] testimony and the testimony of other witnesses and the forensic evidence undermined his credibility far more forcefully." (*Id.*) In other words, Petitioner suffered no prejudice. Even if counsel had objected, the result of the proceeding would not have been different. Even if the prior convictions had been excluded, there was other overwhelming evidence for the jury to question Petitioner's credibility. *Strickland*, 466 U.S. at 694. Petitioner has failed to show that the state court applied *Strickland* to the facts of his case in an objectively unreasonable manner, and therefore is not entitled to

habeas relief on this claim. *Yarborough*, 540 U.S. at 5.

///

### 3. Insufficient Evidence

Petitioner's last claim is that there was insufficient evidence to support the conviction for first degree murder. Petitioner claims that the fact that he shot and killed the victim constitutes at most murder in the second, rather that first, degree. He admits that while the killing was a "rash impulse" and "brutal and unnecessary," it is not enough to support a finding that he acted "with premeditation and deliberation." (Pet. at 21.)

The Court of Appeal denied the claim on appeal, finding there was sufficient evidence showing that the murder was premeditated and deliberate.

> Here, there was ample evidence of premeditation and deliberation. Catalan, Cruz and Johnson all reported that after Lewis had been knocked to the ground, defendant returned to his van, retrieved his shotgun, removed it from a bag, stood over Lewis and shot him while he was unmoving on the ground. Whether defendant intended to kill Lewis when he started the fight with him under the flimsy pretext of being annoyed with the driving of the BMW, or whether that intention was formed after the fight had begun, the evidence that defendant retrieved his shotgun while Lewis was on the ground and shot him at close range is sufficient to support the jury's finding of deliberation. While the Supreme Court has "defined 'deliberate' as '"formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action,"'" and "'premeditated' as '"considered beforehand,"'" "[p]remeditation and deliberation can occur in a brief interval. 'The test is not time, but reflection. "Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly."'" (*People v. Memro* (1995) 11 Cal.4th 786, 862-863; *People v. Perez, supra*, 2 Cal.4th at p. 1127 ["premeditation can occur in a brief period of time. 'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly'"].) Although defendant's version of events differed, the jury was entitled to disbelieve defendant and give credence to the testimony of the other witnesses. We must defer to the jury's finding when it is supported by credible evidence.

(Op. at 11-12.)

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). A state prisoner who alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led

a rational trier of fact to find guilt beyond a reasonable doubt therefore states a constitutional claim, *see Jackson v. Virginia*, 443 U.S. 307, 321 (1979), which, if proven, entitles him to federal habeas relief, *see id.* at 324. *See, e.g.*, *Wigglesworth v. Oregon*, 49 F.3d 578, 582 (9th Cir. 1995) (writ granted where Oregon procedure of allowing lab reports regarding drug analyses to be admitted into evidence without authenticating testimony relieved state of its burden to prove beyond reasonable doubt all elements of crime charged); *Martineau v. Angelone*, 25 F.3d 734, 739-43 (9th Cir. 1994) (writ granted where evidence found insufficient to convict defendants of child abuse based on delay in seeking medical care for child).

A federal court reviewing collaterally a state court conviction, as in the case at bar, does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt. *Payne v. Borg*, 982 F.2d 335, 338 (9th Cir. 1992), *cert. denied*, 510 U.S. 843 (1993). The federal court "determines only whether, 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *Jackson*, 443 U.S. at 319). Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt, has there been a due process violation. *Jackson*, 443 U.S. at 324; *Payne*, 982 F.2d at 338; *Miller v. Stagner*, 757 F.2d 988, 992-93 (9th Cir.), *amended*, 768 F.2d 1090 (9th Cir. 1985), *cert. denied*, 475 U.S. 1048, *and cert. denied*, 475 U.S. 1049 (1986); *Bashor v. Risley*, 730 F.2d 1228, 1239 (9th Cir.), *cert. denied*, 469 U.S. 838 (1984).

Viewing the evidence here in the light most favorable to the prosecution, it is clear that any rational trier of fact could have found that Petitioner committed the crime with premeditation and deliberation. In California, "premeditated" means "'considered beforehand,'" and "deliberate" means "'formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action.'" (Op. at 9, citing CALJIC No. 8.20 (5th ed. 1988).) The Court of Appeal discussed that this standard does not require "'any extended period of time'" but rather focuses on "'the extent of the reflection.'" (*Id.* quoting *People v. Mayfield* (1997) 14 Cal.4th 668, 767.) Consistent with these definitions, the Court of Appeal found there was "ample evidence" of premeditation and deliberation: three

witnesses all reported that after the victim had been knocked to the ground, Petitioner "returned to his van, retrieved his shotgun, removed it from a bag, stood over [the victim] and shot him while he was unmoving on the ground." (Op. at 11.) The jury was entitled to give more weight to the testimony of these witnesses over Petitioner's version of events which was markedly different and self-serving. Despite Petitioner's assertion that the killing was a result of a "rash impulse," the evidence showed that he retrieved his shotgun while the victim lay immobile and then shot him at close range. (*Id.*) These facts are sufficient to support the jury's finding of deliberation, *i.e.*, that Petitioner engaged in "'careful thought and weighing of considerations for and against'" in deciding to shoot an immobile and unarmed man. (Op. at 9.) Accordingly, the California Court of Appeal's rejection of this claim was not contrary to or an unreasonable application of clearly established federal law. 28 U.S.C. § 2254(d)(1).

## CONCLUSION

For the reasons set forth above, the petition for writ of habeas corpus is DENIED.

The federal rules governing habeas cases brought by state prisoners require a district court that denies a habeas petition to grant or deny a certificate of appealability ("COA") in its ruling. *See* Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254. Petitioner has not shown "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Accordingly, a COA is DENIED.

The Clerk shall close the file.

IT IS SO ORDERED.

DATED: 12/9/11

LUCY H. KOH
United States District Judge